The **KENDALL COMPANY,**
Plaintiff–Appellant,

v.

**PROGRESSIVE MEDICAL TECHNOLOGY, INC.,**
Defendant–Appellee.

No. 95–1444.

United States Court of Appeals,
Federal Circuit.

June 4, 1996.

Paul J. Hayes, Weingarten, Shurgin, Gagnebin & Hayes, Boston, Massachusetts, argued for plaintiff-appellant. With him on the brief was Dean G. Bostock.

Jeffery V. Stuckey, Dickinson, Wright, Moon, Van Dusen & Freeman, argued for defendant-appellee. With him on the brief were Gregory L. McClelland, Lansing, Michigan, and Conrad J. Clark, of Washington, D.C.

Before ARCHER, Chief Judge, LOURIE and SCHALL, Circuit Judges.

LOURIE, Circuit Judge.

The Kendall Company appeals from the decision of the United States District Court for the Western District of Michigan granting summary judgment of noninfringement in favor of Progressive Medical Technology, Inc. *Kendall Co. v. Progressive Medical Technology, Inc.*, No. 5:93–CV–89 (W.D. Mich. June 12, 1995). We affirm.

## BACKGROUND

Kendall is the assignee of U.S. Patent 4,253,449, directed to a medical device for applying compressive pressure to a patient's limbs in order to increase blood flow and treat or prevent deep vein thrombosis. The patented device is comprised of three basic components: a controller-pneumatic pump for supplying pressurized fluid, a pair of pressure sleeves that wrap around a patient's limbs, and connecting tubes.[1] A commercial embodiment of the invention, known as the "Kendall SCD System," is illustrated below:

1. Claim 1 is illustrative of the claimed invention:

 1. A device for applying compressive pressures against a patient's limb from a source of pressurized fluid, comprising:

 a pair of first and second elongated pressure sleeves for enclosing a length of the patient's limbs, with said sleeves each having a plurality of fluid pressure chambers;

 a first set of a plurality of conduits in communication with chambers in said first sleeve;

 a second set of a plurality of conduits in communication with chambers in said second sleeve, with the number of conduits in said second set being the same as the number of conduits in said first set;

 a third set of a plurality of conduits in communication with said source, with the number of conduits in said third set being the same as the number of conduits in said first and second sets; and

 means for connecting the conduits of said third set with the conduits of said first and second sets with each conduit in the third set being connected to only one conduit in each of said first and second sets to establish communication between the source and the first and second sleeves.

Kendall sold its SCD System to medical care facilities, knowing that, in order to reduce the risk of contamination between successive patients, its customers planned to replace the pressure sleeves after each use by a single patient. Kendall did not discourage this practice and, in fact, marked "FOR SINGLE PATIENT USE ONLY. DO NOT REUSE." on the packaging of the replacement sleeves that it sold to its customers. In the district court, Kendall did not contradict Progressive's sworn statement that:

> Customers buy the Kendall controller and tubing assembly with the understanding that they are to be used repeatedly and on different patients. Customers buy the Kendall sleeves, on the other hand, with the understanding that they are to be used only on a single patient and then discarded. The buyers of the Kendall SCD System purchase the controller, the tubing assembly, and a plurality of sleeves with the understanding that many sets of sleeves will be used and discarded long before the controller and tubing assembly are worn out.

In addition, Kendall submitted an affidavit explaining that the pressure sleeves must be replaced after each use because, "In the hospital environment, there is a likelihood that the 'SCD' sleeves may be contaminated by a patient's blood, body fluids and other excretions because the sleeves come into direct contact with the patient's skin and any cuts, sores or other abrasions on the skin." The resulting market for replacement sleeves has

been substantial; Kendall's sale of replacement sleeves has accounted for about eighty million out of the eighty-five million dollars in total annual sales.

Although Kendall's customers replaced the pressure sleeves after each use, not all of them purchased replacement sleeves from Kendall. Some purchased replacement sleeves from Progressive, which supplied replacement sleeves to medical care facilities that had purchased the complete SCD System from Kendall. Consequently, in July 1993, Kendall sued Progressive alleging, *inter alia*, contributory infringement of the '449 patent. Following discovery, Progressive moved for partial summary judgment of noninfringement, arguing that, since Kendall's customers acted within their right to repair the SCD System by replacing the pressure sleeves after each use, they did not directly infringe the '449 patent. Thus Progressive did not contributorily infringe. In opposition, Kendall argued that the repair doctrine did not apply because the sleeves were not physically worn-out when they were replaced and could have been used repeatedly for three years or more before wearing out. The district court held that there were no genuine issues of material fact and that, under the repair doctrine, purchasers of Kendall's SCD System did not directly infringe the '449 patent when they replaced the sleeves after each use. Because there could be no contributory infringement absent an act of direct infringement, the court granted summary judgment of noninfringement in fa-

vor of Progressive. All other claims in the lawsuit were resolved by settlement agreement and consent judgment. This appeal followed.

## DISCUSSION

■ Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Johnston v. IVAC Corp.,* 885 F.2d 1574, 1576–77, 12 USPQ2d 1382, 1383 (Fed.Cir.1989). Thus, summary judgment is justified when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In determining whether there is a genuine issue of material fact, the evidence must be viewed in the light most favorable to the party opposing the motion, with doubts resolved in favor of the nonmovant. *Transmatic, Inc. v. Gulton Indus., Inc.,* 53 F.3d 1270, 1274, 35 USPQ2d 1035, 1038 (Fed.Cir. 1995). "When there are no genuine issues of material fact, 'the question ... whether the defendant's conduct constituted permissible repair is answerable as a question of law.'" *Sage Prods., Inc. v. Devon Indus., Inc.,* 45 F.3d 1575, 1577, 33 USPQ2d 1765, 1766–67 (Fed.Cir.1995) (quoting *Dana Corp. v. American Precision Co.,* 827 F.2d 755, 758, 3 USPQ2d 1852, 1854 (Fed.Cir.1987)). We review de novo a district court's grant of summary judgment. *Conroy v. Reebok Int'l, Ltd.,* 14 F.3d 1570, 1575, 29 USPQ2d 1373, 1377 (Fed.Cir.1994).

It is unclear whether Kendall contends that there was any genuine issue of material fact precluding summary judgment; its briefs do not point to any evidentiary conflict in the record. Having carefully reviewed the record, we agree with the district court that the essential facts set forth in the parties' affidavits do not conflict and there was no genuine issue of material fact. Thus, we will consider Kendall's arguments to be that Progressive was not entitled to summary judgment of noninfringement as a matter of law.

■ The dispositive question here is whether purchasers of Kendall's complete SCD System *directly* infringed the '449 patent when they replaced the pressure sleeves after a single use with sleeves purchased from someone other than Kendall. Without direct infringement by these purchasers, Progressive could not have contributorily infringed the '449 patent. *See* 35 U.S.C. § 271(c) (1994); *Aro Mfg. Co. v. Convertible Top Replacement Co.,* 365 U.S. 336, 341, 81 S.Ct. 599, 602, 5 L.Ed.2d 592 (1961) (*Aro I*) ("[I]t is settled that if there is no *direct* infringement of a patent there can be no *contributory* infringement.").

Direct infringement includes, *inter alia,* the making or using of a patented invention "without authority." 35 U.S.C. § 271(a). Thus, the specific issue that we must address is whether Kendall's customers acted "without authority" when they replaced the pressure sleeves after each use. The district court held that such action was within their right to repair the SCD System. Kendall maintains, on appeal, that the court misapplied the repair doctrine by "ignor[ing] factual evidence that the sleeves [were] not physically exhausted" and could have been reused for three years or more before wearing out. This argument is unpersuasive.

■ When Kendall sold its patented SCD System to its customers it granted them an implied license to use the device for its useful life. *See Aro Mfg. Co. v. Convertible Top Replacement Co.,* 377 U.S. 476, 484, 84 S.Ct. 1526, 1531, 12 L.Ed.2d 457 (1964) (*Aro II*) ("[I]t is fundamental that sale of a patented article by the patentee or under his authority carries with it an 'implied license to use.'") (quoting *Adams v. Burke,* 84 U.S. (17 Wall.) 453, 456, 21 L.Ed. 700 (1873)). That implied license to use included the right to repair the patented article and necessarily to purchase repair parts from others. *E.g., Standard Havens Prods., Inc. v. Gencor Indus., Inc.,* 953 F.2d 1360, 1376, 21 USPQ2d 1321, 1333 (Fed.Cir.1991), *cert. denied,* 506 U.S. 817, 113 S.Ct. 60, 121 L.Ed.2d 28 (1992). The right to repair is implied as a matter of law. As the Supreme Court explained in *Aro I:*

> [I]t is "the use of the whole" of the combination which a purchaser buys, and ... repair or replacement of the worn-out, damaged or destroyed part is but an exer-

cise of the right "to give duration to that which he owns, or has a right to use as a whole."

*Aro I,* 365 U.S. at 342–43, 81 S.Ct. at 603 (quoting *Wilson v. Simpson,* 50 U.S. (9 How.) 109, 123, 13 L.Ed. 66 (1850)).

■ We have noted that "[t]he Supreme Court has taken an expansive view of conduct that constitutes permissible repair of a patented combination of unpatented elements." *Sage Prods.,* 45 F.3d at 1578, 33 USPQ2d at 1767. Thus, when a patentee sells a patented device to a purchaser, without restriction, direct infringement will occur only when there is a complete "reconstruction" of the device. Replacement of individual unpatented components, on the other hand, is permissible "repair," not direct infringement:

> The decisions of this Court require the conclusion that reconstruction of a patented entity, comprised of unpatented elements, is limited to such a true reconstruction of the entity as to "in fact make a new article," *United States v. Aluminum Co. of America, supra,* [148 F.2d 416] at 425 [(2d 1945)], after the entity, viewed as a whole, has become spent. In order to call the monopoly, conferred by the patent grant, into play for a second time, it must, indeed, be a second creation of the patented entity, as, for example, in [*American*] *Cotton–Tie Co. v. Simmons, supra* [106 U.S. 89, 1 S.Ct. 52, 27 L.Ed. 79 (1882)]. Mere replacement of individual unpatented parts, one at a time, whether of the same part repeatedly or different parts successively, is no more than the lawful right of the owner to repair his property.

*Aro I,* 365 U.S. at 346, 81 S.Ct. at 604.

■ Here, the district court, relying on *Aro I* and our precedent, determined that the replacement of pressure sleeves by Kendall's customers after a single use constituted permissible repair, not direct infringement. The court placed particular reliance on our decision in *Sage Products,* stating that "the facts . . . of *Sage* are exceedingly close to the facts here." We agree with the district court that *Sage Products* is controlling precedent and effectively disposes of Kendall's principal contention that the repair doctrine does not apply because the pressure sleeves were not

physically worn-out when they were replaced.

In *Sage Products,* the patented device was a system for disposing of potentially contaminated medical waste. It consisted of an outer container, which could be mounted on a wall, and a cooperating, removable inner container for receiving waste. The device was designed so that when the inner container became full, it could be removed and discarded. Sage, the patentee, sold the device to customers with the understanding that the inner container would be discarded when it became full. Sage marked a "BIOHAZARD-SINGLE USE ONLY" warning on the inner container, and its literature instructed customers to discard filled inner containers.

■ The defendant, Devon Industries, sold replacement inner containers to customers who had purchased the complete patented system from Sage. Sage sued Devon alleging contributory and induced infringement. The district court granted summary judgment in favor of Devon. On appeal, Sage argued that the repair doctrine did not apply because the inner containers were not *physically exhausted* and thus were in no need of repair when they were replaced. Sage offered evidence that the inner containers could have been emptied and reused, and that the containers were, in fact, reused by some hospitals. We rejected the argument, stating:

> This court has never said that an element is spent only when it is impossible to reuse it. Like the district court, we believe that *when it is neither practical nor feasible to continue using an element that is intended to be replaced, that element is effectively spent.* See *Everpure,* 875 F.2d at 303, 10 USPQ2d at 1857. When the inner containers marketed by Sage are filled they are effectively spent and the user may replace them without infringing the '413 patent.

*Sage Prods.,* 45 F.3d at 1578, 33 USPQ2d at 1767 (emphasis added).

The same principle applies here. Although, as Kendall urges, the replacement sleeves theoretically could have been used repeatedly for three years or more before

they physically wore out, this practice would not have been feasible because of the risk of contamination between patients. Kendall's customers never agreed to sterilize and reuse the sleeves. Moreover, Kendall sold its SCD System knowing that, to prevent contamination between successive patients, the sleeves would be used once and then discarded. It marked "FOR SINGLE PATIENT USE ONLY. DO NOT REUSE." on the packaging of its replacement sleeves. Kendall thus clearly intended to permit its customers to replace the sleeves after each use; its product labelling instructed them to do precisely that. Therefore, we conclude that the district court correctly held that, consistent with *Sage Products*, Kendall's customers' right of repair included the right to replace the pressure sleeves after each use.[2]

Kendall attempts to distinguish *Sage Products* by pointing out that the specification of the patent at issue in that case mentioned that the inner containers were preferably disposable, whereas the '449 specification is silent as to whether the sleeves were for single-use only. We find the distinction to be of no consequence. The implied right to use (and repair) a purchased patented item exists whether or not the patent specification teaches that particular components may be replaced. A purchaser may repair or replace *any* unpatented component that wears out or otherwise becomes "spent," whether or not the patentee believed at the time the patent application was filed that it would be necessary to do so. Thus, the '449 specification's silence concerning the replaceability of the pressure sleeves does not matter. We also reject Kendall's contention that the district court "entirely ignored" the fact that the '449 specification does not teach that the sleeves are disposable. That the district court did not discuss this fact in its opinion does not mean that the court "ignored" it. To the contrary, we believe that the court's well-reasoned opinion shows that the court considered all the relevant evidence.

Moreover, as long as reconstruction does not occur or a contract is not violated, nothing in the law prevents a purchaser of a device from prematurely repairing it or replacing an unpatented component. Premature repair is the business of the purchaser of the product, who owns it, rather than the patentee, who sold it.

Kendall further argues that its "concededly valid and reasonable restriction on the sleeves should at least limit application of the repair doctrine," relying on *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700, 24 USPQ2d 1173 (Fed.Cir.1992). We disagree that *Mallinckrodt* helps Kendall. In that case, Mallinckrodt, the patentee, sold patented inhalers to hospitals subject to a notice that they were for "single use only." The "single use only" notice referred to reuse of the entire patented device. The hospitals *disregarded* that notice and permitted the defendant, Medipart, to collect used inhalers from the hospitals, recondition them, and sell them back to the hospitals for reuse. When Mallinckrodt sued Medipart for infringement, the district court held, on summary judgment, that *all* restrictions on a purchaser's use of patented goods were invalid as a matter of law and therefore the single-use notice placed on the inhalers by Mallinckrodt was *per se* invalid and unenforceable.

We reversed and remanded the case for a proper determination of the enforceability of the single-use notice under antitrust and patent misuse principles based on application of the rule of reason. In addition, we stated that, if it were determined on remand that the single-use notice was an enforceable contractual restriction, the hospitals' reuse of the inhalers contrary to that restriction would be a breach of contract; it would be *unlicensed* and thus directly infringe the patent. Consequently, Medipart would potentially be liable for contributory infringement. We stated that, in such case, there would be "no need to choose between repair and reconstruction" because "even repair of an unlicensed device constitutes infringe-

2. Kendall repeatedly argues in its briefs that its customers *imposed* the single-use restriction on Kendall. There is nothing in the record to support this assertion. Moreover, if Kendall acquiesced to its customers' demand that they have a right to replace the sleeves after each use, this would support, rather than undermine, the district court's conclusion that the customers acted within their right of repair.

ment." *Mallinckrodt,* 976 F.2d at 709, 24 USPQ2d at 1180; *see Aro II,* 377 U.S. at 480–85, 84 S.Ct. at 1528–32. Thus, in *Mallinckrodt,* we recognized that *breach* of an enforceable condition of sale or license may leave the breaching party open to a claim for patent infringement. *See* 35 U.S.C. § 271(a) ("[W]hoever *without authority* makes, uses, offers to sell or sells any patented invention . . . infringes the patent.") (emphasis added).

 Here, unlike the facts in *Mallinckrodt,* Kendall's customers *followed* rather than disregarded the single-use notice. They replaced the pressure sleeves after each use. Also, Kendall's customers did not agree to purchase replacement sleeves *from Kendall.* Kendall argued in the district court that such an obligation existed in view of the statement in its product literature that, "To ensure product safety and efficiency, the Kendall SCD Compression System must only be used with SCD Sleeves and Tubing Assemblies." The district court correctly recognized that this language did not have contractual significance; by its terms, it was only the manufacturer's recommendation for purposes of "safety and efficiency," not a customer obligation. Thus, Kendall's customers did not directly infringe the '449 patent based on breach of a condition of sale or a restriction in an express or implied license.

In sum, although the pressure sleeves were not physically worn-out, they were effectively spent because of the risk of contamination between successive patients. Replacement of the sleeves after each use was necessary, as a practical matter, for Kendall's customers to continue to use the complete SCD System. *See Wilson,* 50 U.S. (9 How.) at 123 (right of repair allows purchasers "to give duration to" the patented combination). Kendall, recognizing this practical necessity, marketed its replacement sleeves for single-use only. Moreover, necessity aside, Kendall's customers had the right to repair the SCD System by replacing the pressure sleeves after each use; they did not act "without authority" in doing so and did not directly infringe the '449 patent. *See*

*Sage Prods.,* 45 F.3d at 1578–79, 33 USPQ2d at 1767–68; *see also Everpure, Inc. v. Cuno, Inc.,* 875 F.2d 300, 10 USPQ2d 1855 (Fed. Cir.) (affirming summary judgment that replacement of spent filter cartridges was permissible repair, not direct infringement), *cert. denied,* 493 U.S. 853, 110 S.Ct. 154, 107 L.Ed.2d 112 (1989). Since Kendall's customers were not direct infringers, Progressive could not have been liable as a contributory infringer. *See* 35 U.S.C. § 271(c); *Aro I,* 365 U.S. at 341, 81 S.Ct. at 602 (absent direct infringement there can be no contributory infringement).

We have considered Kendall's remaining arguments but find them unpersuasive. At oral argument, Kendall's counsel made a "sky is falling" plea, pointing out that an affirmance of the district court's decision would make it uneconomical for companies to invent and develop devices like that involved in this case, because much of the profit arises from sale of the replaceable sleeves rather than from sale of the original device. If that is so, we are not of course in a position to guess whether the result is related to the pricing of the original device, the failure to obtain effective patent protection for the replaceable sleeve,[3] or other factors. In any event, such an adverse economic outcome for the patentee cannot overcome the established law on repair. None of Kendall's legal arguments are persuasive that the district court erred in its analysis or that, under the facts before us, Kendall is entitled to prohibit Progressive from selling replacement sleeves to purchasers of Kendall's device.

### CONCLUSION

The district court did not err in determining that there was no genuine issue of material fact and that Progressive was entitled to summary judgment as a matter of law. We therefore affirm the court's judgment.

*AFFIRMED.*

---

**3.** The sleeve is apparently the subject of one or more U.S. patents, but those patents were not asserted against Progressive.